Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Michael B. Hyman presiding, case number 23-0100, Illinois Automobile Dealer Association v. Illinois Secretary of State. Good afternoon. My name is Justice Michael Hyman. With me is Justice Carl Eddie Walker and Justice Sanjay Taylor. We're going to proceed as if we were in the courtroom. Each side will have 20 minutes. The appellees, if you're going to split your argument, please let us know how much time you're allowing to each of you to argue. And as far as the appellant is concerned, please let us know how much time you wish of your 20 minutes for rebuttal. If there are no questions, please introduce yourselves and answer that question. So, Mr. Levin. Is it Levin? It is Levin. Thank you, Justice Hyman. So, and by the way, I had a little audio trouble. My office IT people were here. Hopefully, I won't bounce off this screen. I'm sure it's not the first time it might happen, but hopefully we're set. But I'll, you know, if I disappear. We're prepared for anything and all of us will deal with it. Don't worry. I appreciate it. Anything happens. I reserve five minutes on the back end, if that's okay. That's fine. Oh, Mr. Grossman. Okay. Thank you, Justice. Andrew Grossman, on behalf of the Rivian and Lucid entities. The appellees have decided to equally split their time. So, we'll each have 10 minutes. Thank you. Okay. Thank you. Good afternoon, your honors. Assistant Attorney General Evan Siegel on behalf of Secretary of State Alexi Julius. Thank you. We will then proceed, Mr. Levin. May it please the court. Counsel, as you know, I represent the plaintiffs in the case below and here, which are more than 300 licensed new vehicle dealers throughout the state of Illinois and four state associations who collectively represent more than a thousand dealers located in every corner of the state and all other parts. My clients have millions of dollars in permanent investments. They employ thousands of Illinois residents and they contribute a great amount to the tax base in the state of Illinois. This is a case of first impression, I believe, and it is a vital importance to my clients. And the cases, I think, you know, giving a license, a motor vehicle dealer license to sell Rivian and Lucid vehicles to separate manufacturers directly or through a controlled affiliate to the public in the state of Illinois. There's two statutes and I think they kind of, they go together, but they interact together. I just want to quickly walk you through that, if that's okay. The Illinois. Mr. Levin, as you walk us through the statute, because we want to listen to you closely, but I want to ask you, you frame the issue as to whether or not this is permitted the direct sale. And I think the issue is really whether or not the legislature has precluded it. So if you can kind of focus on that, because when you, you're throughout your brief, you argue about whether this is permitted in the statute. And I think the real question is whether it's precluded. So if you could kind of really stay with what the real question is, as you argue, I think it'll help us to follow you a lot better. Thank you, Justice Walker. I certainly will try to do that. Thank you. So, and I do think there's a prohibition here, whether it's as express as some other states that put it into place is different, but the way this act works is as follows are the two acts. We've got the Illinois vehicle code that contains the licensing requirements for any dealer who wants to do business in the state to sell cars and service cars to all of us or any of our neighbors and friends. The requirement under that section 501, 5101 of the vehicle code is very clear. The secretary can't issue a license to anybody to sell cars in this state or service them unless there is a contract in writing between the manufacturer of the vehicles and the licensee, that's the dealer. So you start by having a two person contract. So that is simply an agreement to sell cars and a license to sell cars and the licensee is the in that setting. We don't believe in the first instance that the secretary issued a license in accordance with its own requirements under the vehicle code. They do not have. Let me ask a question. Sure. So you're talking about whether you believe Illinois law prohibits these manufacturers from selling their own cars directly to consumers, correct? I do. Okay. And you had a prior lawsuit where a similar manufacturer is selling cars directly to manufacturers, I mean directly to consumers. How can that possibly be under the argument you just raised about the statute? How could it be improper when the attorney general entered into a settlement that allowed a manufacturer to sell directly in Illinois and been doing so for many years? If what you say is true, then the attorney general is violating state law. Is that correct? Judge, I agree with you that the licenses that Tesla is currently operating in the state of Illinois and as confirmed in the administrative consent order that is part of the record before you, says that that license was improper. It was not properly issued. Tesla had previously gotten a license somehow through the state process. Then the state turned around, the secretary of state, and says, we're not renewing your license because we don't believe the license is proper. And that led to litigation at the secretary of state level, administration level. And ultimately there was an agreement. I wasn't part of that particular case, but there was an agreement because Tesla had been given the license and put in play their direct sales model in Illinois. That agreement, which I think they call a settlement agreement according to the state or to Rivian and Lucid, is what it is. It's not squarely an analysis on what this case is, which is before Rivian and Lucid ever came into play in this state, or got a license, we filed this lawsuit. And we filed this lawsuit with the intent to make sure that the secretary followed the rules, which all of my clients have to follow. My point is that if you are correct, then Tesla cannot operate because you can't have it that you could settle something that violates state law. And your clients were part of that settlement, as I understand, correct? It is correct that the CATA and the IADA were part of that administrative consent order. The 300 dealers plus who I represent- It doesn't really matter. The fact is that they're operating. And so what happened is, are you asking that Tesla be treated differently than the two manufacturers in this case? Is that going to be a result? If we rule in your favor, isn't that one result? And isn't that a violation of law? Well, if this court agrees with my position, and I certainly hope it does, or it remands it for further proceedings to focus on whether the license application was proper in the first place. Remember, we're here on a 2615 decision. So this is a de novo review. But if, in fact, the decision is that the act says the vehicle code says this, and that's the requirement for a license, a two-party agreement to sell vehicles, and that in turn creates what we believe is a franchise under the Motor Vehicle Franchise Act, which is applicable to any person doing business in this state involving the sale or offering of motor vehicles. That act, the Franchise Act, is a very important second component of this. So if you go, you start with the code, did the license get issued properly? We don't think it did. And the clarity of the vehicle code says what it says. You have to have two people and the manufacturer licenses with its other party to allow them to sell their vehicles in the state of Illinois. Yeah, but again, it's happening two ways, and that can't be. If we rule in your favor, what I believe you're saying is then Tesla would be at risk. Is that what you're saying? Well, whether Tesla could enforce somehow the administrative consent order that the Secretary and the other parties signed, in which it was acknowledged that the Secretary's position was that all vehicles sold in the state had to be through franchise dealerships, I don't know the answer to that question, Judge. I guess that would play out in due course. But the Secretary is now taking the position that, yes, we previously agreed to this with Tesla, but now the Attorney General, the top legal officer in the state, has told us what the law is and that we agree, well, not that we agree, but that we're following the law given to us by our Attorney General. That's the position now of the Secretary of State. The Secretary of State has changed his position. You're right, Justice Walker. And when they wrote that informal opinion, which is part of the record, the associations wrote back and said to them, and by the way, informal opinions by the Attorney General are not to be relied on. We cite cases that I think. But nevertheless, what was interesting about that informal opinion was they left out the vehicle code. They left out the very first part of the analysis that said, if you want to sell a car. We know later what they said. They said later that it didn't make a difference. And that gets down to what you were just starting with. What you're saying is we have to take these two different, the code and the franchisees, uh, act, and we have to look at both of them and we have to kind of look between the lines. I mean, it's not ambiguous, you say, but it doesn't come out and say it. And you're asking us to make a major decision that this legislature should make. And that's what the judge said is there's nothing explicit here that would prohibit what's going on. And you're saying that, well, it's there, you know, just look at this and look at this. And even though the purpose of the statutes is different, the franchisee statute is to protect your clients, protects your clients and their businesses. And the other one was about stealing parts and trafficking in cars and so forth. Different times, different legislatures, completely different. But you want them to read them in tandem. So, well, not really, not exactly. They do interrelate. It's all about motor vehicles. It's about getting license to sell it. And then it's about the protections that section three of the franchise X applies to anybody selling or offering vehicles in the state. So that franchise act applies, even independent of the vehicle code and the license itself. But if I may judge, there is a case I want to direct your attention to that I think is a helpful guide. It was to me, and it hopefully will be to the court. And that is the Tesla case out of Utah. They had the same kind of arrangement. They had... We're all familiar with it. But my understanding of that case, having read it, is that the issues are different. They didn't get into the issue you had before us. It was a tax question. So, and if you want to get into that, what other states are saying, I believe there's decisions in, I think, Delaware and some other states that say the exact thing in this case, that the appellees are saying. So, if you get into what's going on in different states around the country, where some states, as you know, have said that you can't do this in our state, and they said it explicitly. And that's the problem here. You're asking us to find something by... You agree it doesn't say it explicitly. You have to agree to that. I agree that there's not an express prohibition. I agree with you, Justice Hyman. But a statute doesn't have to say, shall not. A statute is to be read in accordance with its plain meaning. There's no ambiguity, legislative history notwithstanding, which we don't look at. These statutes have to be read. First, do you get the license? And second, if you do, are you technically a franchise under our act? The acts aren't perfect. I understand an express prohibition would be a clearer way to see it. I understand that. But it doesn't mean that the law as applied is different than what we've argued. And those other... Go ahead. Mr. Levin, can I ask you a question? Is your argument that essentially one that is a vertical integration prohibition in the car industry, is that the point you're making ultimately? Well, certainly the effect of having a manufacturer who controls all of its prices, has many fewer service centers, all the things that are the negative part of a model that some of these other direct sale manufacturers have, is a negative for the consumers of Illinois, we believe. Those are policy reasons that aren't necessarily necessary to the determination of, did the secretary follow the license procedure? And in our Franchise Act, and I just want to make this point because I know my time is short, it is clear there is a section 4F that says a manufacturer cannot operate a dealership in the state of Illinois, other than on the limited circumstances that a dealer's gone out of business and they're trying to keep the place alive for customers in the area of service and bring their cars into. That 4F provision has meaning to it. There's a reason why the legislature said manufacturers may not, through a subsidiary that they have more than 1% of, control the process of selling cars in the state. They lose, in our opinion, your honor, the court below, this was a 2615, I remind once again, and we never got into what is the agreements, all we have is a letter in the record from Rivian that was sent to the secretary of state or Lucid. There's no two-party contract that was produced or offered by them, and it is a 2615 setting. So from our perspective, it was premature, certainly for the trial court to take this step, but basically we have to see what we find in what they supplied or what their other documents show. And if you look... The reason why I ask you, Mr. Levin, is this is really picking up on Justice Hyman's question. There are examples in the Illinois statutes where, you know, vertical integration is prohibited. For example, you know, I recall that I had a case involving the Video Gaming Act, and that statute prohibits the same person from owning the three players in that industry. Those are the manufacturer of the video gaming device, the terminal operator, and the retail establishment. The statute says it expressly. Here you're asking us to, you know, pick statutes together to come up with a conclusion when we know the legislature knows how to do it, if it wants to do it. Yes, I understand that. And I think if 4F, the franchise act on its own, applies to every dealer, anybody selling cars in the state, and whether or not there's an agreement between the two parties that have the license, that act applies, and that act says a manufacturer may not operate the franchise. And we believe that that applies, even if you took that act alone and said the license was valid. We don't think the license was valid, but the arrangement that has to exist between Rivian and its subsidiary is applicable to the Franchise Act. And the Franchise Act is express and expressly prohibits the operation of a dealership by the manufacturer, and that's 4F. So I believe that, I'm sorry. No, go ahead. I think you answered the question. What I was going to ask, because you are running out of time, is give us, you know, I'm going to ask you to give us your best arguments, and some are better than others, but give us what you think is your best argument. If we're going to rule in your favor, I mean, this is the one that really puts it together. What argument do you think is the home run here? Okay. So in my view, the trial court, or the lower court, acted quickly and on a 2-6-15 basis. They did not allow any of these issues to be explored. So from a procedural standpoint, it should be remanded on that alone. If you look at the licensing statute, the vehicle code, it requires a two-party agreement. Nothing in the record shows that a two-party agreement, a manufacturer giving a separate party, can't be yourself, a right to sell their cars. It doesn't exist in this record. Secondly, the Franchise Act, which all of these dealers use the Rivian label or the Lucid label on their building. So if you look at the definition of franchise under the Franchise Act, that is exactly what they're doing. And the court in Utah said Tesla tried to say, we didn't give them our rights, but they said they sure did. It's right on the side of the building. And so ultimately, you have to apply that Franchise Act and they don't allow manufacturers in the state to operate dealerships other than on some narrow circumstances for a very limited period of time. We have a big impact on the entire state should this model become the model that goes on and on. And the buildings you see and the people that are employed are impacted by this over time, certainly, and the investments that my clients have made. And then the consumer protections. The ability to service your car is a pretty important thing. Cars are the second biggest purchase of your life. Now you're getting into policy, I guess. You're right. Are there any other questions from the panel? Okay. Why don't you wrap up here and then you still have your five minutes. No, I think I've made my point. I think the court below needed to explore what was the license application. Did the secretary issue that without following its own rules? And then secondly, what is that agreement? And the Franchise Act application of that definition has to apply. And if it does, then we go to the prohibition against the manufacturer operating its own dealership. Thank you. Appellees? Good afternoon, Andrew Grossman for the Rivian and Lucid appellees. I plan to address the statutory issues and Mr. Siegel, representing the Secretary of State, will address the plaintiff's constitutional and mandamus claims. Of course, we're both happy to answer questions on any topic. The fundamental defect with the dealer's argument is that no provision of Illinois law prohibits Rivian and Lucid from selling vehicles directly to consumers. That's why their main statutory argument requires smashing together two separate statutory schemes to discover a prohibition that is not set forth in either of them. But they're saying 4F. They're saying 4F. That's right there. They can't be... That's the key is the 4F, right? But that's their argument. Why, you know, they can't enter into a contract with themselves. What is the response? Well, so I understand. I think the two-party contract, I think, is their argument under the vehicle code, section 5-101-D1. And let me say a couple of things about that. First of all, if the point of that provision was to prohibit manufacture direct sales, that is about the most obscure and obfuscated way on the face of the earth to do it. In fact, we know to a certainty that the dealer's interpretation that you have to have this two-party arrangement cannot possibly be what the legislature intended. That requirement was enacted in 1941, and other provisions of the code at that time specifically contemplated manufacture direct sales. So we know that the legislature simply did not embrace this position that there has to be a two-party agreement. And I want to be clear, this is not a legislative history argument. This is a statutory context argument. It revolves on the text of the statute at the time that this requirement was interpreted, and you can't interpret that requirement to conflict with other statutory provisions in literally the next statutory section over. And we also know with a certainty what the legislature was trying to do with the authorization requirement. We know that because there is a statutory purpose provision that's in section 5-100-1. The legislature is trying to create a chain of authorization from the manufacturer to the dealer to the ultimate purchaser to prevent trafficking in stolen vehicles. The point of the authorization requirement is that there be authorization by the manufacturer. Now, you can disagree with us on all of that, and you can say, well, they're right about the two-party thing. I don't think that's correct, but even if you, let's just spot them that for the sake of argument, the plaintiffs have pleaded themselves out of court on this provision. If you look at paragraphs 9 and 10 of their amended complaints, and that's at page 1733 of the record, they acknowledge that there are, in fact, two parties for each of Rivian and Lucid. There's the manufacturing affiliate, and then there is the sales affiliate. So, there are two parties here in this instance. And I also want to note that my friend, Mr. Levin's point that there is no contract that is in the record here, that the secretary did not demand the contracts. There is no basis for any such demand or requirement in the statute. What the requires, and this is in section 5-101B4, is, quote, a signed statement from each manufacturer or franchise distributor. Those were not only provided, those were stapled to the complaint. The provision D1 that mentions the contract in writing, there is nothing in the statute that requires that to be produced to the secretary. I suppose if the secretary wanted, the secretary could ask for it, but that is a matter of discretion to the secretary, what was required with the signed statement from the manufacturer. And as I said, those were attached to the complaint. I will address, of course, the franchise act. If you don't, Mr. Grossman, they're arguing that the Illinois Motor Vehicle Franchise Act specifically provides that a manufacturer cannot operate a franchise. So do you want to respond to that argument? Yes, your honor. We think that that is just wrong as a textual matter on its face based on the specific language of the provision. The provision states that a manufacturer cannot, quote, own or operate a place of business as a vehicle franchisee. Now, section 4, I'm sorry, the franchise act defines two closely related but very different terms. They are motor vehicle dealer, which is broader, and then a specific type of motor vehicle dealer, which is a franchisee. If the point of this provision was to ban all manufacturers from operating motor vehicle dealers, the language that the prohibition would have used would have been motor vehicle dealers. They are effectively asking the court to rewrite the statute to use the term that the legislature did not use. There are additional contextual cues that that choice of language was deliberate. If you look at section 4 as a whole, section 4a makes clear that what's in that entire statutory section is basically a listing of unfair methods of competition and unfair acts and practices. Nobody has ever said that there is no case law recognizing that simply a manufacturer selling its own goods is unfair in any respect. Indeed, if you look at all the provisions in section 4, all the other provisions and prohibitions in section 4, they all relate to the relationship between the manufacturer and its franchisees, sometimes prospective franchisees, a couple places previous franchisees, but the point is that they all regulate that relationship and they have no application outside the context of that relationship. And my friend Mr. Levin, you know, then says, well, put all that aside. We still think that Rivian and Lucid, we think they are franchisees because, well, they've got an agreement with their sales affiliates or something like that and that makes them a franchisee. That could not possibly be right. I mean, nobody has ever interpreted the word franchise to mean an agreement between, let's say, in Rivian's case, a parent corporation and its subsidiary. For example, you know, Apple sells iPhones through Apple stores. It's a very common thing for companies that have their own retail outlets to put those retail outlets in their own corporations or LLCs. Nobody on the face of the earth would ever say that if you purchase an iPhone from an Apple store, that that somehow makes the Apple store or Apple itself a franchisee. Indeed, would the same thing be true? Like, take McDonald's, has franchises and they also have their own stores that they have. That is exactly right, Judge Heisman, and that was another example I was going to get to. The camera is a good example. They're also a very good lunch. But you're exactly right. I mean, you know, I read the Wall Street Journal every morning and there are lots of articles about McDonald's and its business operations and every single one of those articles distinguishes between McDonald's franchisees, in other words, the ones that are owned by independent entities and McDonald's own company stores. I will tell you, as a matter of corporate structure, those company stores are all within a subsidiary of the parent McDonald's corporation. That's how everybody organizes their affairs for liability reasons and other reasons. So that sort of arrangement is not unusual. And we've got over a century's worth of franchise law and the plaintiffs have not been able to identify a single case or an authority, an article, anything that supports this bizarre notion that a corporation and either its affiliate or its subsidiary are engaged in some type of franchise relationship. That's just not how any of this works. And indeed, it doesn't make any sense. I mean, the whole point of franchise law is that you have an inherent conflict of interest between a manufacturer and its dealers. The dealers invest money in the business. The leverage and superior market position to abuse the dealers. That's why you have these very elaborate franchise agreements that lay out interlocking obligations. And it's why you have franchise laws like the states of Illinois that prevent the types of abuses by manufacturers against their dealers. None of that makes any sense to apply in the context of corporate affiliates where there simply is no conflict of interest. And indeed, all of this law, franchise law, is reflected in the definition of franchise that is in Section 2 of the Franchise Act. One of the prerequisites for a franchise in Section 2 is a community of interest between the different parties to the agreement. A community of interest is a term of art in franchise law, and it refers to the way that the parties come together and interlock their economic interests, which would otherwise be divergent. And that simply has no application whatsoever to entities that are under common ownership. I mean, it's like saying, I mean, for example, like, you can't marry yourself. In that same respect, you can't have two related companies that are under common ownership that, you know, all that's between them is just, you know, that they're affiliated companies, that they somehow come together to create a community of interest, when in reality, all of their interests have been perfectly aligned. And in the case, you know, they are subject to the same control from day one. So in that sense, you know, as a statutory matter, this sort of franchise argument fails on its own terms. And I think what's significant about that is... We're running out of time. It's almost up. Are there any other questions? Mr. Grossman? Yes, sorry, I was muted. I was going to ask Mr. Grossman, if you want to just take a quick second to respond to all the other arguments that Mr. Levin has raised in his brief, not all of them, but just a few. The one additional point I would make, and thank you for that, Justice Walker, is simply to address this argument that if you smash together these two statutes, you somehow wind up with some other result. That's simply not how the imperi materia canon of construction works. I mean, we don't think these statutes are related, but putting that aside, the idea of that canon is to make sure there's not a conflict between the statutes. We don't think there's a conflict here. But even going beyond that, we can't, you know, a corporate affiliate can't be a franchisee. So you can smash the statutes together however you want, and it just doesn't change that. So we think for that reason that additional argument fails. And if there are no further questions, we would ask the court to affirm. Thank you. Thank you. Good afternoon, Your Honors. Again, it's Evan Siegel, Assistant Attorney General on behalf of the Illinois Secretary. And as co-counsel mentioned, I will be addressing the constitutional and mandamus issues this afternoon. We urge the court to affirm the circuit court's due process holding because the dealers have no due process right here under either the Illinois or United States constitutions. Under state law, a due process claim requires both cognizable property interest and a deprivation of that interest. And starting with that first element, it's essentially... I know we didn't get into this with the appellant, but I want to go back to one of the questions I asked Mr. Levin, and that is, what would happen to Tesla? I mean, the fact is that if that settlement is against the law, how could it have been entered into? And what's the effect of that? I mean, what is... I mean, we can't... we'd have a situation, we talked about in the process, where two deal... two manufacturers cannot operate, and then another one can, and they're both... situations are identical. So how does that work? You're completely correct on this point, Justice Hyman. It's contradictory for the dealer associations who joined this settlement agreement or administrative consent decree to take the position that it was okay in 2019 when the parties, including the Secretary, entered into this agreement, given the state of the law and everybody's understanding of the law, and yet for a contrary ruling to come out from this court that would cast into question Tesla's ability to operate in this state under the statutes as they are now written. And of course, Tesla's not a party to this action, but they do have 13, I believe, sales outlets across the state per that administrative consent decree. So a decision here reversing the circuit court would imperil that arrangement. Would that agreement have been made if anybody with the government thought that it was improper under the statute? No, I don't believe that. I know we haven't... there was no judicial decision, and that's what we're doing here, so I'm not saying that, but... That's correct. There was an understanding and it was legal. That's correct. And then this arrangement was further determined to be legal when the Secretary in around 2019 sought the informal opinion from the Attorney General, which we delivered to the some time in 2020. And then this litigation ensued. So if I may return to the due process element, just really briefly, there's no property interest that's protectable here. They haven't identified one, except to allege that there's this dual system that they call the bypass system and the established franchise system, and that only the old system, the established franchise system, can be legally permissible. There is no bypass system per se. There are three electric manufacturers in contrast to the 306 car dealers on the caption. And these different modes don't create a property interest, let alone establish one, because the dealers have vested financial interests in the system they operate in. Just to return to fast food for a moment, Dunkin' Donuts outlets are, by and large, franchises. When Starbucks came on the scene, and those are mostly company owned, the Dunkin' Donuts franchises could not be said to have a vested property interest in how they were doing business, simply because there was competition. And that's essential and key here, an overarching and fundamental point that the dealers appear to ignore is that under Illinois law, a marketplace participant isn't protected from competition per se. That's this court's holding nearly 50 years ago in two cases, Image Supplies and Roosevelt Wabash Currency. Even if they establish that they have a property interest, they weren't deprived of that interest by virtue that these new manufacturers have arrived on the scene and sell directly to consumers. So the claim here is speculative, it's not based on fact, and the circuit court correctly dismissed it. And I just want to point out also that on pages 23 and 24 of the reply brief, the dealers struggle to identify a protectable property interest. They discuss a number of things that have nothing to do with the property interest. And elsewhere in their reply brief, they seem to concede, at least insofar as the statutory questions that issue, that they don't have a property, a protectable property interest. What about the argument, Mr. Grossman, I got to ask this question to either of you, with regard to procedural. This is a motion dismissed, and they're saying, well, wait a minute, we don't have all the facts out there yet. And really, we should give them another chance. That's not correct, Your Honor. The plaintiff is master of its own complaint. They had to allege a cognizable complaint. And they could not rest on speculation about whatever arrangements Rivian and Lucid may or may not have had with their affiliates. It turns out, though, that as my co-counsel mentioned, there is, in the attachment to the amended complaint, letters to the secretary explaining the arrangement to sell these vehicles through other entities. So, they have failed to state a complaint as a matter of law. 2615 is absolutely the correct vehicle to dismiss these, to dismiss their claims. Unequal protection, really briefly, this court need not and should not address that issue because the circuit court, and the court likely didn't decide it because the dealers have conflated their equal protection and their due process claims into a single count violating section 2603B of the code. And on that basis alone, dismissal of the complaint is warranted. Each separate cause of action must have a separate complaint count. They didn't do that. They haven't explained that to this point. If this court, however, decides to reach the merits for some reason on equal protection, the dealers fail at the threshold because the party bringing an equal protection claim has to be similarly situated to the comparison group. But as we've been discussing, the dealers talk about these two disparate systems, the bypass and the established franchise system. So, they have essentially, again, pleaded themselves out of court by contrasting these two systems. They are alleging that they could not be more different than Rivian and Lucid. And we have pointed out a number of examples in our brief about these differences. When you delve into the details, I won't go through them all. But just as one example, the dealers represent manufacturers that have multiple locations in Chicagoland. So, these dealers like Honda, for instance, or Chevrolet, they're competing with each other. That's not the case for Rivian and Lucid. There's no competition within the entity. In short, the dealers could not be more dissimilar from Rivian and Lucid, dooming any equal protection claim. And finally, on Mandamus, briefly, the dealers weren't entitled to relief here because the secretary's role was not ministerial. We've been having this discussion this morning, this afternoon, rather. Reasonable people can differ on the legal implications of the provisions at issue. That debate, that discussion, the fact that there was an attorney general opinion makes it indisputable that there was nothing rote or automatic here that compelled the secretary to reach a given decision. And Mandamus cannot be directed to a public official to reach a particular decision or to exercise his discretion in a particular manner. And that's so even if he makes a decision that's incorrect. So, it's dispositive here that Mandamus can't compel a decision when there's inherent discretion involved. The dealers, by the way, as we argued, make no substantive mention of Mandamus in their opening brief. We've argued that results in forfeiture. And I just want to briefly, in their reply brief, they argue that Mandamus was an alternative basis that we raised on which to affirm the circuit court. But that's not so. Mandamus was an independent claim, has nothing to do with equal protection or due process. It was count one of their complaint, four separate complaints. And the circuit court held they weren't entitled to Mandamus and didn't reach that claim. So, it's not an alternative basis that they could have for us to address in our response brief. If the court has no further questions, I see that I'm at the end of my time. We would ask this court to affirm the judgment of the circuit court. Thank you. Thank you. Mr. Levin. Thank you, Justice Simon. So, I hear a lot about iPhones and Starbucks and Dunkin' Donuts. One of the things I really think is so important to my clients and I think of great interest to the consumers of this state is that we have our own franchise act. That act matters. And the purpose of that act, where the legislature declares that the distribution and sale of vehicles within this state vitally affects the general economy. And the act is there to regulate both manufacturers and dealers and to protect the public in all things relating to the sale of vehicles. The applies to all persons, including Rivian and Lucid. And the Secretary of State knows that. And trying to skirt the act and trying to skirt 4F is really what they're trying to do, Judge. And only Mr. Grossman, who said, well, we're not really a franchise under the definition in Section 2 of that act. That franchise definition, which was the identical definition in the Utah case, was met there in that case when they had the same arrangement through an affiliate and a manufacturer that was owned 100 percent by each. And all it says is it's an arrangement for a definite or indefinite period in which a manufacturer or distributor grants a license to a dealer to use their trade name, service mark. There was no granting in your complaint. Where's the granting? Well, that's specifically where in your complaint you talk about granting. I mean, you need three factors. That was a second. Well, I don't know. I guess the answer to that question is I heard Mr. Grossman say we had an agreement, but we didn't have to give it to the state because the state just told us we had to say whether they had agreement or not. He said the state never asked. In the record, there's nothing about an agreement, which is more reason to send it back to the trial. Not necessarily. You have the burden. It's your complaint. I understand that. But the vehicle code, which led to a license in this case, has an express requirement that Mr. Grossman and I think the state knows because they have followed it, that there must be a contract in writing with the manufacturer that authorizes the licensee to sell such vehicles. If there is a franchise. But their position is they're not a franchise because they're solely owned and operated. They're all one. It's one. It's like the McDonald's. It's like Starbucks. I understand what you're saying about a specific statute, but you still need to show that this is a franchise. And I don't disagree. I'm sorry, Justice. I don't disagree. I don't disagree with you. But that definition of franchisee or franchise and franchisee, which is within the code, is a descriptive that we're going to give the guy who sells our products the ability to use our mark. That mark's on the building. Even if they try and disclaim that, which Tesla did in the Utah case, the court said, we're not going for that. You're obviously allowing them to use your mark because it's on the building and it's on the products that you're selling. So the idea that they don't have an express contract that said, we grant you the use of the mark, doesn't mean they haven't granted them the use of the mark. We don't agree with you on the applicability of the Utah case. What's your fallback? Well, I think the Utah case is there for instruction. I don't necessarily think it's identical. But even then, my fallback is the law. My fallback is the code and the Illinois Motor Vehicle Franchise Act. And to suggest that they don't have anything to do with each other when they deal with motor vehicles being sold within the state of Illinois, and even the licensing is mentioned within the Franchise Act itself. So, Justice, I appreciate that you've given me good questions in terms of the issues that are before the court. I think it would be, it's not just important and maybe it would take some courage, but I believe if you look at these acts and the way the Secretary acted when they allowed Tesla, even though they said the Franchise Act and the code don't really allow you to have a license, you disagree, so we're going to make a deal. That's what they did with Tesla. In this particular case, they went right by their licensing requirements. There may be other reasons they did that, and they went right by the Franchise Act. And that Franchise Act, for my clients, and I do a lot of work in this area, is the protection for them and their families and the buildings and the employees they have throughout the state. I know that's policy, but it's important and it follows what the law is. So, whether we go back and explore that further with whatever underlying documents they have, I urge the court to vacate or reverse the decision on a 2-6-15 motion, allow us at a minimum to go back to the court, and or what my preference, of course, is if you agree with me on the application of both the act and the code, then to reverse the court outright and send it back for proceedings consistent with that. With that, I thank you. Now, Mr. Berman, the Illinois Motor Vehicle Franchise Act defines both the motor vehicle dealer and the franchisee. And let's just say for a second that we agree with you that the manufacturer cannot be a franchisee, but there's no, but it's not precluded from being a motor vehicle dealer in the act. So, do you want to respond to that? Well, the definition of motor vehicle dealer and franchise are right next to each other, H and I, and franchisee, which is K, within Section 2. You can be both. Ultimately, the franchise, I don't know that there's a situation where a dealer who has to be given an agreement to sell their cars by a manufacturer, that's how you get your license, isn't anything other than a franchisee or having a franchise when they use the mark of the parent manufacturer to sell their cars. So, we explained that, I think, a little bit maybe perhaps better in our brief, but they they have to be subject to the act because the definition of franchise is met, even though they don't want to call themselves a franchise, just because you call one thing, you know, not a duck when it looks like a duck, it is a duck, as they say. And that's exactly what the case is here, because they're using the marks and they have this arrangement to sell cars. And that's the protection that the act affords. So, the definitions are not mutually exclusive, they may be a subset of each other, motor vehicle dealer and franchise. It seems to me that the franchisee would be a subset of a motor vehicle deal. Do you agree with that? Well, I don't know. I can't think of a circumstance, Justice Walker, where a motor dealer wouldn't be a franchisee because of the way the licensing works. So, I understand your point. And I think that, you know, to suggest that they're that Rivian is just a motor vehicle dealer on its own and allowed to bypass or skirt the act. I don't think so. I think it says it's it's it has this wholly owned subsidiary who they're going to do business through and section F says you can't do that. You have all we're looking for is a level playing field and the playing field is all these dealerships. So, you see every day, I'm sure, as you as you go about your business are are invested so heavily. And if they allow anybody to say we don't have a franchise, we don't we're not giving you the mark. But in fact, they're acting in that same capacity. They will undercut these dealers to the point where they will we will lose jobs. We will lose lots of things in in the state of Illinois. And that's what the act is there to protect. But I think that the definitions are met in this case. And the Utah case said exactly that with the exact same definition in our act for franchise. Exactly the same. All right. Well, thank you very much for all three of you for your briefs, your arguments. Very enlightening. You all did an excellent job. It is a case of first impression. And we appreciate giving us something to chew on today. And we'll take it under advisement and be ruling forthwith. So thank you very much. Thank you. Good afternoon to all of you.